Doty v. Crystal Ice & Fuel Co.

---

No. 27,105.

ANNA L. DOTY, as an Individual, and as Guardian of HENRY BLAINE DOTY et al., *Appellees,* v. THE CRYSTAL ICE AND FUEL COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. TRIAL—*Special Interrogatories — Discretion of Court as to Manner and Form.* The trial court has discretionary supervision of the form and nature of special questions which may be submitted to a jury, and may properly refuse to submit questions which are highly technical, or which are not focused on the ultimate facts of the matter in issue, or which are designed merely to recapitulate the evidence rather than to determine the facts proven by the evidence.

2. WORKMEN'S COMPENSATION ACT—*Death from Injury in Plant—Evidence.* Under the evidence adduced, the trial court properly refused to set aside the jury's finding that plaintiffs' husband and father came to his death as the result of an accident and injury sustained while working in defendant's ice plant.

Trial, 38 Cyc. pp. 1512 n. 25, 1909 n. 21, 1911 n. 26. Workmen's Compensation Acts, C. J. pp. 106 n. 43, 127 n. 95; L. R. A. 1917D, 135; L. R. A. 1918E, 559; 28 R. C. L. 825.

3. SAME—*Death from Injury in Plant—Demand for Compensation Within Six Months Sufficient.* Where a workmen sustains injuries in his master's service which eventually cause his death, a demand for compensation on behalf of his widow and dependent minor children made within six months of the workman's death is legally sufficient under the statute. (R. S. 44-520.)

4. SAME—*Instructions.* Errors assigned in instructions given and refused considered and not sustained.

Appeal from Montgomery district court; JOSEPH W. HOLDREN, judge. Opinion filed February 12, 1927. Affirmed.

*W. E. Ziegler, Carl Ziegler,* both of Coffeyville, *E. H. Henning* and *A. M. Etchen,* both of Kansas City, for the appellant.

*Thurman Hill,* of Independence, and *Charles D. Welch,* of Coffeyville, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This is the second appearance of this case in this court. (118 Kan. 323, 235 Pac. 96.) It was an action by a widow and her dependent minor children for compensation for the death of her husband through an injury alleged to have been sustained in defendant's ice factory.

Plaintiffs alleged that their husband and father, Bert Doty, on January 20, 1923, while employed in the ice plant of defendant sustained a fall from a scaffold and received an injury to his head from which he died some four months afterwards. The petition also alleged the giving of notice and demand for compensation, defendant's refusal to arbitrate, plaintiffs' right to $3,800 as compensation and prayed judgment for that amount.

Defendant's answer, among other matters, denied that Bert Doty died of any injury sustained in its service, and that no demand for compensation within ninety days subsequent to the accident had been made on defendant.

The issue most sharply contested before the trial court and jury was whether Doty's death was caused by his fall in the ice plant or whether he succumbed to a disease, cerebrospinal meningitis, not traceable to his fall and injury in the course of his employment.

On behalf of plaintiffs it was shown that until his fall and injury at defendant's ice plant in January, 1923, Doty was an able-bodied man, 52 years of age, of exceptionally good health, strength, vigor, and eyesight, weighing 160 pounds, spry, and a quick walker, and a good workman. In the accident Doty received a noticeable wound

Doty v. Crystal Ice & Fuel Co.

on the left side of his head above and back of the ear, and about the size of a half dollar. (Whether the skin was quite broken or only bruised was a matter of disagreement among plaintiffs' own witnesses.) Doty fell about six feet and the wound in his head was apparently caused by striking against an iron pipe as he fell backwards from a scaffold or platform on which he was working. Doty was rendered unconscious for a brief interval. Almost immediately after his fall and injury in January, he began to lose weight; he suffered severe headaches; his eyes became "starey" and vaguelooking, with the pupils dilated; he was inattentive and seemed to be dazed, he complained much of pain in his head over his left ear; his body was cold, and he required frequent doses of aspirin; he walked slowly like an aged person, with a halt in his steps and his feet dragged. However, notwithstanding these apparently developing consequences, he returned to defendant's service in three days after his fall and so continued until May 5, at which time he changed his employment and worked four or five days in a door factory, and also worked out in the country. He took to his bed about May 20, by which time he had lost about 25 pounds since his fall and injury in January. On May 31 he died, and up to the last he complained of pains in his head. His attending physician certified the cause of Doty's death as cerebrospinal meningitis, but all the eyewitnesses about his sick bed testified that there were no symptoms of convulsions.

On the other hand there was testimony in defendant's behalf which tended to show that no serious consequence followed Doty's fall. A fellow workman testified:

"A. Well, they were working up on a scaffold trying to start a pipe into a collar when the scaffold broke. One of the boys caught onto the pipe and held up there and Mr. Doty fell on the floor. We started to help him up and he got up without our help. He swore quite a bit and said he was all right. . . .

"He was on the floor a very short time. Probably not over 15 seconds. We did not carry him. There was no one carried him any place. He walked down stairs with his arms across my shoulders and Dawson's. We helped him along and he walked. . . . He wasn't gone over two or three days. When he came back to work he did the same as he had before the accident. There was no change whatever that I could see. I worked along with him, until he left. I never noticed any difference in his eyes, nor in his speech, nor his walk."

There was a good deal of medical expert testimony offered by

defendants to the effect that Doty's illness and death were not traceable to his fall and the blow on his head at the ice plant. A professional chemist and bacteriologist made laboratory tests of spinal fluid taken from Doty shortly before his death. His reports, in part, read:

"EXAMINATION OF SPINAL FLUID, MAY 28, 1923:

| | |
|---|---|
| First portion | Turbid. |
| Second portion | Clear. |
| Formation of pellicle | Positive. |
| Globulin test | Positive. |
| Cell count | 200 per cmm. |
| Wassermann | Negative. |
| Bacteriological examination, intracellular diplococci | Present. |

EXAMINATION OF BLOOD:

| | |
|---|---|
| White cell count | 13,600. |
| Wassermann | Negative. |

EXAMINATION OF SECOND SPECIMEN SPINAL FLUID, MAY 30, 1923:

| | |
|---|---|
| Color | Greenish. |
| (Decided green on standing.) | |
| Pellicle | Positive. |
| Cell count | 500 per cmm. |
| Intracellular gram negative diplococci | Present. |
| Culture (nutrient agar) gram negative biscuit-shaped diplococci | Present." |

Another of defendant's professional witnesses, Dr. J. B. Blades, testified that he, too, had participated in the performance of two spinal punctures upon Doty to obtain spinal fluid for diagnosis:

"Q. From your examination and observation of Mr. Doty and the result of the laboratory findings of the spinal fluid taken from Mr. Doty, have you an opinion as to what he died with? A. I have.

"Q. State what that opinion is? A. The diagnosis was cerebrospinal meningitis.

"Q. What form? A. Epidemic type. . . .

"Q. This disease of cerebrospinal meningitis of the epidemic form is the result of a bacteria? A. Yes, sir.

"Q. Does trauma have anything to do with it—or injury? A. No, sir. . . .

"Q. Doctor, you say you pronounced this epidemic spinal meningitis? A. Cerebrospinal meningitis; yes, sir.

"Q. By epidemic you mean it is catching?

.    .    .    .    .    .    .    .    .    .    .    .    .

"A. The length of time required for it to affect a person is not definitely known; from a few days to three or four weeks. Due to the susceptibility of the individual."

Doty v. Crystal Ice & Fuel Co.

This same witness, on cross-examination and without objection, gave certain testimony tending to support plaintiffs' side of this case:

"When a man gets a blow on the head he sometimes has a concussion. If there is unconsciousness there is intracranial pressure. Concussion is an injury due to a blow which renders unconsciousness or partial consciousness. There may be no injury to the brain at all. My understanding of contusion is damaging the tissues. I don't think there is a real distinction between concussion and contusion. . . . A man striking his head on some hard object could have a hemorrhage on the inside of the brain that would not show on the outside. The effect would be pressure on the brain, loss of consciousness, and if it was very extensive, paralysis. The classical symptoms are headache, pressure on the brain, paralysis, loss of vision. Headache is one of the symptoms of brain injury. A fixed dilated pupil is a symptom of intracranial pressure. There is some exceptions to it."

One matter of some evidential significance against the contention that cerebrospinal meningitis caused Doty's death was the complete absence of convulsions which usually attend that dread disease.

The jury returned a general verdict for plaintiff, and answered certain special questions:

"Q. 1. For how long a time, if at all, was Albert Doty incapacitated from work as a result of any injury he may have sustained on January 20th, 1923? A. Not over three days as shown by evidence.

"Q. 2. Was Dr. J. B. Blades one of the attending physicians who attended Albert Doty during his last sickness up to and including the time of his death on May 31, 1923? A. Yes, in advisory capacity.

"Q. 3. Did, Dr. J. B. Blades during said time assist in making two spinal punctures and obtain specimens of spinal fluid from Albert Doty for the purpose of making a laboratory test? A. Yes. . . .

"Q. 6. Is the disease of cerebrospinal meningitis of the epidemic form caused by bacteria? A. Yes; according to testimony.

"Q. 7. Do you find that on or about January 20, 1923, Albert Doty, while in the employ of the defendant, in the course of his employment, fall from a scaffold backward, striking his head against some object? A. Yes.

"Q. 8. Do you find that there was a mark or bruise on the head of Albert Doty, as the result of said fall? A. Yes.

"Q. 9. Do you find that the said Albert Doty came to his death on account of an injury he received on or about the 20th day of January, 1923? A. Yes."

Defendant appeals, specifying various errors, including one based upon the trial court's refusal to submit two special questions, viz.:

"Q. 6. Does the laboratory test of spinal fluid taken from a person suffering from cerebrospinal meningitis of the epidemic form, show intracellular gram negative diplococci to be present in such fluid? . . .

42—122 Kan.

"Q. 7. Does the laboratory test of such spinal fluid show the formation of a pellicle in cases where the person from whom such spinal fluid was taken was suffering from cerebrospinal meningitis of the epidemic form?"

Special questions are propounded to a jury to bring out some or all of the determinative facts which should be considered in the formation of a jury's general verdict. Such questions may aid in sifting the jury's reasons for their verdict; they may show how closely or otherwise the jury has followed the trial court's instructions (*Morrow v. County of Saline,* 21 Kan. 484, 503, 504) ; and they may and often do show the measure of sincerity with which the jury has considered the evidence on which the general verdict must rest if it is permitted to stand (*Underwood v. Fosha,* 96 Kan. 240, 246, 150 Pac. 571). Not infrequently the jury's answers to special questions enable the court—and compel it—to enter judgment thereon in favor of one litigant although the general verdict might be in favor of his adversary. (R. S. 60-2918; *Tacha v. Railway Co.,* 97 Kan. 571, 155 Pac. 922; *Priest v. Life Insurance Co.,* 117 Kan. 1, 230 Pac. 529.)

In *Jones v. Interurban Railway Co.,* 92 Kan. 809, 815, 141 Pac. 999, it was said:

"The legislature recognized the fact, known to all judges and practitioners, that juries may render general verdicts that do not square with the facts in the case and with the instructions of the court. The only way to test the work of the jury is by requiring them to find the facts, and when the special findings and the general verdict disagree the special findings must control. Besides this, special findings give the trial court when reviewing the case on a motion for a new trial, and this court on appeal, a grasp of the controversy which can be obtained in no other way." (p. 815.)

But the trial court may and should exercise its discretion not only as to the number but also to the form and nature of the questions. The statute says special questions must deal with the facts as established by the evidence and not the evidence adduced to prove those facts, and "they must be so presented that nothing remains to the court but to draw from them conclusions of law." (R. S. 60-2918.) In *Jones v. Interurban Railway Co.,* supra, it was said:

"The right to special findings, however, is subject to regulation by rule, and is subject to certain conditions which the practical administration of justice makes essential. Thus the application must be timely, the questions must be proper in form, and they must elucidate the facts. They can not be used to cross-examine or to confuse or entrap the jury, and other limitations exist." (p. 815.)

Doty v. Crystal Ice & Fuel Co.

In *Abell v. Railway Co.*, 115 Kan. 132, 222 Pac. 91, this court said:

"2. It is not reversible error to refuse to submit to a jury a special question where the answer to the question, by itself or in connection with the answers to other questions submitted, could not have been contradictory to the general verdict or could not have compelled a different judgment." (Syl.)

In the instructive case of *Freedman v. New York, N. H. & H. R. Co.*, 81 Conn. 601, 614, it was said:

"We shall not attempt to formulate definite rules for determining accurately in every case just what interrogatories may be so submitted to the jury. It may, however, be well to state the following, as some of the general requisites of such permissible interrogatories: They should generally be few in number, and never so numerous as to confuse or perplex the jury in rendering their verdict. They should be so clear and concise as to be readily understood and answered by the jury. Each question should call for a finding of but a single fact. When practicable each question should be so framed as to call for a categorical answer. Each question should ask for the finding of a fact and never for a conclusion of law. No question should ask for the finding of a purely evidential fact nor of an uncontroverted fact. Although not wholly covering, nor necessarily controlling, the determination of any issue framed, the fact sought to be elicited must be pertinent to some issue, and one which may be of material weight in deciding it. No interrogatory should be permitted the response to which cannot serve either to limit or explain a general verdict, or aid in proceedings for a subsequent review of the verdict or judgment which may be rendered." (p. 614.)

In 27 R. C. L. 865, it is said:

"The purpose of . . . special findings in answer to interrogatories, by eliciting a determination of material facts, [is] to furnish the means of testing the correctness of the verdict rendered, and of ascertaining its extent."

Elsewhere in the same volume, p. 871, it is said:

"Questions to the jury should relate to the ultimate facts and not merely the evidential facts on which such ultimate facts rest, and the court is justified in refusing to submit questions which call for evidence, whether in the submission of a special verdict or a special interrogatory addressed to the particular finding. The purpose of having the jury find specially on a particular question is to ascertain the fact itself and not merely the evidence which may tend to prove it, or an abstract of the evidence; hence parties to an action have no right, under the guise of submitting questions of fact to be found specially by the jury, to require them to give their views on each item of evidence, thus practically subjecting them to a cross-examination as to the entire case." (See, also, *Snyder v. Eriksen*, 109 Kan. 314, syl. ¶ 3, 198 Pac. 1080; *Winfrey v. Automobile Co.*, 113 Kan. 343, syl. ¶ 5, 214 Pac. 781; 38 Cyc. 1909 *et seq.*; Phillips on Code Pleading, 551.)

Scrutinizing the special questions in the light of the statute and the discussions and precedents set out above, it cannot be said that the trial court erred in refusing to submit them to the jury. Although we have read defendant's abstract with laborious care, if the duty were imposed on us to answer these questions we would certainly have to requisition a first-class medical encyclopedia. Not only were defendant's special questions highly technical, but they were not concretely focused on the ultimate facts of this particular case; and rather obviously they violated the code rule that they be framed to elicit the facts established by the evidence and not to recapitulate the evidence adduced to prove them. Defendant contends that if the jury had been permitted to answer these two questions, "their answers thereto would have been conclusive in this case." We think not. The expert medical testimony was to the effect that cerebrospinal meningitis of the epidemic type would develop from its inception to fatality within three or four weeks, while there was abundant testimony—which the jury chose to believe—that Doty's ailing began immediately after the accident in January and continued with progressively increasing gravity and consequences until he died at the end of May. However, it is not at all unlikely in view of the defendant's evidence that Doty did become afflicted with cerebrospinal meningitis toward the latter end of his days, but whatever answers favorable to defendant a jury might have made to these two special questions it would grossly usurp the functions of the jury and flagrantly disregard the plaintiffs' evidence for the trial court or this court to conclude therefrom as a matter of law that Doty's death was not caused by accident sustained in his employer's service in January, 1923. The error assigned on this point is not sustained.

2. Error is also assigned on the trial court's refusal to set aside the jury's special finding No. 9, which was that Doty came to his death through the injury he sustained in January, 1923. Counsel for defendant seeks to persuade us that the evidence which attributed Doty's death to an altogether different cause was vastly more entitled to credence than the evidence which supported the jury's finding. But the jury, acting with the approval of the trial court, is the arbiter of the issues of fact, and it is needless to expatiate on the familiar subject of the limitations of appellate review touching ascertained facts which have *some* competent and *no* incompetent

Doty v. Crystal Ice & Fuel Co.

evidence as a basis for their determination. (*Bayer v. Cockrill,* 3 Kan. 282; *Blakeslee v. Morgan,* 118 Kan. 486, 490, 235 Pac. 1042.)

3. We note another error suggested in the overruling of defendant's motion for judgment on the jury's answers to the special questions. The suggestion lacks merit.

4. It is next urged that the jury should have been instructed to return a verdict for defendant because no claim for compensation was made within three months after the accident. Doty was injured on January 20; he died May 31; and his widow and children presented their claim on August 14. No earlier claim was presented on behalf of his dependent family. The statute reads:

"R. S. 44-520. Proceedings for the recovery of compensation under this act shall not be maintainable unless written notice of the accident, stating the time, place and particulars thereof, and the name and address of the persons injured, has been given within ten days after the accident, and unless a claim for compensation has been made within three months after the accident or in case of death, within six months from the date thereof."

This is a claim for compensation on account of .the *death* of the workman. The fair interpretation of the statute is that in case of the workman's death, his dependents have six months from the date thereof, *i. e.,* from the date of the death, in which to make claim for compensation. (See *Hopper v. Wilson & Co.,* 111 Kan. 539, 207 Pac. 757; *Johnson, Guardian, v. Milling Co.,* 114 Kan. 470, 219 Pac. 256.) Counsel for appellee make the point that defendant is trying this case by piecemeal, and that the question of law concerning the time allowed in which to make demand was not raised in the first trial or the first appeal and should not now be considered (*Estes v. Zinc Co.,* 97 Kan. 774, 156 Pac. 758); but we prefer not to leave unsettled such an important feature of this remedial statute. Indeed the real service which an appellant in a case of this sort contributes to the common weal is in getting an authoritative adjudication of questions of this sort.

5. Error is also assigned in the giving and refusing of certain instructions. We have examined them. The court did not err in refusing to instruct that "liability cannot rest upon imagination, speculation or conjecture." The jury were sufficiently instructed that plaintiffs must maintain their cause by the fair weight and preponderance of the evidence, and that the jury "must be satisfied and believe from the evidence" that the death of Doty resulted from

the accident in his employer's service, "and if you do not so find and believe your verdict will find for the defendant."

6. Another error urged is that "the court wholly failed to instruct the jury with reference to the disease Mr. Doty died of." The court sufficiently covered this point as follows:

"No. 4. You are instructed that if you find from the evidence, that the said Bert Doty sustained an injury, while in the employ of the defendant, by falling and striking on his head and back, as alleged by plaintiffs, and that as a result of said fall and the injuries sustained thereby, his condition became gradually worse, so that his powers of resistance were so lowered that he became infected by cerebralspinal meningitis, or spinal meningitis, whereby he died on or about the 31st day of May, 1923, and that he would not have died except for said injury, then you are instructed that it may be said that his death was the result of an accident growing out of his employment for the defendant."

The other objections to the judgment have been duly considered. They suggest nothing which would permit or justify a disturbance of the judgment, nor warrant further discussion.

The judgment is affirmed.