No. 45,388

RUBY A. BOTT, individually and as administratrix of the Estate of Henry W. Bott, deceased, *Appellants,* v. ARTHUR WENDLER and MRS. ARTHUR WENDLER, *Appellees.*

(453 P. 2d 100)

*Evart Mills*, of McPherson, argued the cause, and *Michael T. Mills* and *William S. Mills*, of McPherson, *Norbert R. Dreiling*, *Dennis L. Bieker*, of Hays, and *John J. Stang*, of LaCross, were with him on the brief for appellants.

*Lee Turner*, of Great Bend, argued the cause, and *J. Eugene Balloun* and *Max E. Eberhart*, of Great Bend, were with him on the brief for appellees.

The opinion of the court was delivered by

FATZER, J.: This was an action for damages arising out of a collision between two automobiles. Ruby A. Bott sued Arthur Wendler, case No. 4365, for the wrongful death of her huband Henry W. Bott, the driver of one of the automobiles. Arthur Wendler, the driver of the other automobile, sued the estate of Henry W. Bott, case No. 4366, for the severe injuries he received in the collision. Artilea Wendler, the fifteen-year-old daughter of Arthur Wendler was also killed in the collision, and Mrs. Arthur Wendler sued the estate of Henry W. Bott, case No. 4367, for the wrongful death of their daughter.

Following a trial to a jury on all the issues designated in the pretrial order, which commenced on May 22, 1967, and ended on May 26, 1967, judgment was entered in favor of Arthur Wendler for his injuries and for Mrs. Wendler for the wrongful death of Artilea Wendler. Ruby A. Bott, individually and as administratrix of the estate of Henry W. Bott, has appealed. As they were designated in the district court, the Wendlers are here referred to as the plaintiffs and the Botts as the defendants.

The district court's order following a pretrial conference was comprehensive. It found there were common questions of law and fact in each of the three cases and ordered the cases consolidated for trial pursuant to K. S. A. 60-242. The order provided that the trial be limited to the issues contained in the order, and the charges of negligence and contributory negligence made by the parties in their pleadings were stated as issues to be determined, as follows:

Ruby A. Bott's grounds of negligence or contributory negligence

against Wendler were that he failed: to drive his vehicle upon the right half of the roadway; to keep a proper lookout at all times; to take proper action to avoid an accident; to properly control his vehicle, and to yield the right-of-way to an oncoming vehicle in its proper lane of travel. Her grounds of contributory negligence against Artilea Wendler were that she failed: to keep a proper lookout; to warn Wendler to drive upon the right half of the roadway, and permitted herself to be transported down the middle of the roadway without objection.

Arthur Wendler and Mrs. Wendler's grounds of negligence, and Wendler's grounds of contributory negligence, against Henry Bott were that he failed: to drive his vehicle upon the right half of the roadway; to keep a proper lookout at all times; to take proper action to avoid an accident; to properly control his vehicle, and to yield the right-of-way to an oncoming vehicle in its proper lane of traffic.

The order further directed that all pictures taken by the parties be submitted to counsel for opposing parties for identification, and they were admitted into evidence subject to objection only to materiality or relevance. It further directed that copies of all statements given by or taken on behalf of Wendler other than those taken by his counsel should be furnished forthwith to counsel for Ruby Bott. The parties announced that all known witnesses had been set forth in their answers to interrogatories, and it was ordered that any witnesses other than those named should be furnished to counsel for opposing parties twenty days prior to trial, and those not so furnished would not be permitted to testify except on rebuttal or for impeachment purposes. It was further ordered that all requested instructions should be submitted at least ten days prior to the trial; that each plaintiff and defendant had the right to exercise three pre-emptory challenges in each case and that there would be eighteen pre-emptory challenges permitted. It was stipulated that $1,819.50 damage was done to the Wendler automobile and $1,500 damage was done to the Bott automobile.

The collision of the two automobiles occurred at about 9:00 or 9:15 a. m., on November 11, 1965, on a north-south gravel county road approximately two miles east and one and a quarter miles south of Alexander, Rush County, Kansas. It was a damp and misty morning. Bott was alone in his 1964 Chevrolet automobile driving in a northerly direction. Wendler was driving his 1965

Ford in a southerly direction; his fifteen-year-old daughter, Artilea, was riding in the back seat. The automobiles collided nearly head on at the crest of a hill in front of the farm home of Clarence Scheuerman at a point where his driveway goes into his yard. The Scheuerman house is located 50 feet west of the county road. As a result of the collision, Bott and Artilea Wendler were killed and Arthur Wendler suffered physical injuries.

Wendler farms, drives a school bus, and maintains roads for the Rush County highway department. He was driving upon a road he last serviced a couple of weeks before the accident. Where the collision occurred, the highway was 27 feet wide from shoulder to shoulder. However, the traveled portion of the road was narrowed to 23 feet by a low windrow of loose gravel pushed there by the grader blade, which was approximately four feet wide and reached to the edge of the grass on the east side of the road.

Scheuerman was a near eyewitness to the accident. He testified he saw the two automobiles approaching each other; that as they neared the point of collision, Wendler was driving on his proper side of the road, or in the southbound lane of traffic, at approximately 50 to 55 miles per hour, and Bott was driving down the center of the road at approximately 35 to 40 miles per hour.

Wendler testified that as he approached the point of collision, he was driving in his lane of traffic about two feet from the west edge of the road; that he noticed a car approaching at approximately the same speed he was driving, when he thought he was about 120 feet north of the impact point; that the car had just come up over a knoll; that he set his brakes and the car kept coming toward him; that it was Bott and he was on Wendler's side of the road; that Bott farmed the land to his right, or east of the highway, and that Bott was looking at the wheat on the land he farmed. The next thing Wendler could remember was his birthday two weeks later.

The evidence was that Wendler's car laid down skid marks, described by various witnesses from 40 to 60 feet, which tended to veer to the right in his lane of traffic; that the skid marks of his right tires were approximately three feet from the edge of grass on the west side of the road; that the skid marks from his left tires were west of the center line of the highway; that the traveled portion of the southbound traffic lane of a roadway 23 feet wide would be eleven feet six inches, and that the left side of Wendler's car would be two and a half feet, or thereabouts, west of the center line; that

Bott's car made no skid marks; that when Wendler's car was moved, the bottom of the tires were cut from rocks and gravel where they had been sliding; that skid marks were under the tires where the rubber was worn off and there was black rubber on the roadway.

At the close of all the evidence, the court fully instructed the jury on all issues of law involved, and, at the defendants request, submitted a special verdict pursuant to K. S. A. 60-249 (a). The written questions submitted for the jury to answer were in the form requested by the defendants. Those questions and the jury's answers read:

"1. If you find that Henry W. Bott was negligent in any manner which directly caused the collision, then please state his act or acts of negligence.

"ANSWER: Failing to keep a proper lookout at all times.

"2. If you find that Arthur Wendler was negligent in any manner which directly caused the collision, then please state his act or acts of negligence.

"ANSWER: None.

"3. Was Artilea Wendler negligent in any manner which directly contributed to the cause of her death?

"ANSWER: Yes—( ); No—(×).

"3a. If your answer is 'Yes' then please state her act or acts of negligence.

"ANSWER: . . .

"4. If you find that Arthur Wendler is entitled to recover from the estate of Henry W. Bott, deceased, how much do you allow him for his personal injuries?

"ANSWER: $100,000.00.

"5. If you allow Arthur Wendler damages for his personal injuries, do you also allow him in addition thereto the sum of $1819.50, the agreed and stipulated value of the Wendler automobile?

"ANSWER: Yes—(×).

"No—( ).

"6. If you find that the next of kin of Henry W. Bott, deceased, are entitled to recover from Arthur Wendler, how much do you allow them for their damages?

"ANSWER: None.

"7. If you allow the next of kin of Henry W. Bott, deceased, to recover for their damages, do you allow Ruby A. Bott, as administratrix of the estate of Henry W. Bott, deceased, to recover the sum of $1500.00, the agreed and stipulated value of the Henry W. Bott automobile?

"ANSWER: No.

"8. If you find the next of kin of Artilea Wendler, deceased, are entitled to recover from the estate of Henry W. Bott, deceased, how much do you allow them for their damages?

"Answer: $27,213.84."

On June 15, 1967, pursuant to K. S. A. 60-258 and in accordance with the jury's special verdict, the district court entered judgment

in favor of the plaintiffs and against the defendants in each of the cases.

The defendants filed motions to set aside the judgment, to set aside the jury's answers, and for judgment on the special verdict. The motions were considered by the district court and overruled. Thereafter, the defendants filed a motion for a new trial based primarily on surprise and newly discovered evidence and affidavits of the defendants and counter affidavits of the plaintiffs were filed in support thereof. Reference is hereafter made to the affidavits and counter affidavits and it is sufficient to say they were fully considered by the district court, and the motion for a new trial was denied.

It is first argued the district court erred in refusing to sustain the defendants' motion for judgment on the special verdict. The contention rests upon the assumption that since the jury exonerated Bott on the charges of being on the wrong side of the road, failing to take proper action to avoid an accident, failing to keep his car under control, and failing to yield the right-of-way, the failure to keep a proper lookout of which Bott was guilty, could not, as a matter of law, have been the proximate cause of the head on collision at the crest of the hill. Our attention is directed to the rule that where several acts of negligence are pleaded as the basis for an action for damages and the jury makes a special finding of the particular act or acts of negligence of which the defendant was guilty, such special finding amounts to an acquittal of any other charges of negligence made against him, and we are referred to *Uhl v. Phillips Petroleum Co.*, 164 Kan. 401, 410, 190 P. 2d 349; *Jilka v. National Mutual Cas. Co.*, 162 Kan. 537, 106 P. 2d 665, and *Rasing v. Healzer*, 157 Kan. 516, 142 P. 2d 832. In making the contention, the defendants state they accept as true Wendler's evidence that just before the collision Bott was looking to his right.

The petition and pretrial order contained one charge to the effect that Bott negligently failed to keep a proper lookout at all times. Thus the jury did not find a ground of liability against Bott which the plaintiffs did not claim. Questions Nos. 1 and 2 were dual in nature and the form in which they were submitted required the jury to determine negligence and proximate cause, that is, to determine causation—the act or acts which "directly caused the collision," and to state whether such act or acts constituted an issue of negligence. The jury's answers to those questions did not absolve

both parties of negligence. It did absolve Wendler. He was charged with exactly the same acts of negligence as was Bott, and the jury found that Wendler was not negligent in any manner which directly caused the collision. In other words, it affirmatively exonerated Wendler from being on the wrong side of the road, and of all the other acts of negligence charged against him.

Special findings are to be liberally construed on appeal and interpreted in the light of the testimony with the view of ascertaining their intended meaning. (*Lee v. Gas Service Company,* 166 Kan. 285, 201 P. 2d 1023; *Sheeley Baking Co. v. Suddarth,* 172 Kan. 533, 241 P. 2d 496.) If the principle urged by the defendants would go no further than to exonerate Bott of other acts of negligence, that is, other than failure to keep a proper lookout, its application would have no effect in determining whether Bott was on the wrong side of the road unless there were some factual inconsistency between that and the facts necessarily supporting the act of negligence the jury did find. If straying onto the wrong side of the road is one of the consequences that can flow from failure to keep a proper lookout, as it clearly is, and if there was credible evidence in the record from which the jury could have found that fact, as there clearly was, then the jury could well have found that Bott was on the wrong side of the road, not as an element of a separate act of negligence but as one of the links in the chain of cause and effect tying the basic act of negligence—failure to keep a proper lookout—with the resultant collision. There is no factual inconsistency between failure to keep a proper lookout and in being on the wrong side of the road, nor is there any legal inconsistency.

In considering the totality of the facts and circumstances, the jury may well have concluded that the main or overriding act directly causing the collision was Bott's complete inattentiveness on the highway—his failure to keep a proper lookout—which act was the unbroken sequence of "happenings which follow one from another" as stated in instruction No. 13, defining causation. In any event, the jury's finding that Bott's negligence in failing to keep a proper lookout at all times was the direct cause of the collision, was entirely proper and supported the judgment entered for the plaintiffs. The district court did not err in overruling the defendants' motion for judgment on the special verdict.

It is next contended the district court erred in not submitting

three special fact questions requested by the defendants. As indi-
cated, prior to the commencement of the trial, the defendants
timely filed their motion for a special verdict (K. S. A. 60-249 [a]),
and requested that ten issues of fact be submitted to the jury. With
the exception of question No. 5 which was not requested, the court
submitted all of the defendants' requested issues of fact in the
form submitted except three. The three issues of fact not submitted
read:

"1. How wide do you find the roadway to have been?

"2. At the time of the collision was any part of the Wendler automobile
to his left of the center of the roadway?

"3. At the time of the collision was any part of the Bott automobile to his
left of the center of the roadway?"

K. S. A. 60-249 (a) reads:

"The judge may require a jury to return only a special verdict in the form
of a special written finding upon each issue of fact. In that event the court
may submit to the jury written questions susceptible of categorical or other
brief answer or may submit written forms of the several special findings which
might properly be made under the pleadings and evidence; or it may use such
other method of submitting the issues and requiring the written findings
thereon as it deems most appropriate. The judge shall give to the jury such
explanation and instruction concerning the matter thus submitted without
commenting on the evidence, as may be necessary to enable the jury to make
its findings upon each issue. *If in so doing the court omits any issue of fact
raised by the pleadings or by the evidence, each party waives his right to a
trial by jury of the issue so omitted unless before the jury retires he demands
its submission to the jury. As to an issue omitted without such demand the court
may make a finding; or, if it fails to do so, it shall be deemed to have made a
finding in accordance with the judgment on the special verdict.*" (Emphasis
supplied.)

The statute is substantially the same as Federal Rule No. 49 (a)
and decisions applying and interpreting the federal rule are per-
suasive. The statute identifies a special verdict as "a special written
finding upon each issue of fact." Its provisions are permissive, not
mandatory and where the court determines to use a special verdict,
it has discretion as to the nature, scope, and form of the questions to
be put to the jury. (*McDonnell v. Timmerman,* 269 F. 2d 54.)
Where a case is submitted for special verdict, the issues of fact
submitted to the jury should cover all issues raised by the pleadings,
the pretrial order, and the evidence. Generally speaking, only ulti-
mate fact questions so raised which are important to the final de-
termination of the controversy should be submitted. (3 Vernon's

Kansas Statutes Annotated [Fowks, Harvey, Thomas], § 60-249a, p. 205.) The authors of 2B Barron and Holtzoff, Federal Practice and Procedure (Rules Edition), § 1055, p. 341, state the rule with respect to the nature and scope of issues to be submitted to the jury, as follows:

"Some courts have said that only ultimate fact questions should be submitted to the jury for determination by special verdict, and that evidentiary issues should not be submitted. Obviously it is undesirable to submit numerous evidentiary issues which merely restate, elaborate, or confirm the jury's decision of the controlling issues, but it must be recognized that the distinction between ultimate issues and evidentiary issues is one of degree only, and that little is gained by seeking to make fine discriminations between one kind of issue and the other."

While Kansas case precedents may not be directly in point in the application of 60-249 (a) which dispenses with the need for a general verdict (Gard, Kansas Code of Civil Procedure Annotated, § 60-249 [a], p. 230), some are applicable to the point at issue. In *Doty v. Crystal Ice & Fuel Co.*, 122 Kan. 653, 253 Pac. 611, it was held:

"The trial court has discretionary supervision of the form and nature of special questions which may be submitted to a jury, and may properly refuse to submit questions which are highly technical, or which are not focused on the ultimate facts of the matter in issue, or which are designed merely to recapitulate the evidence rather than to determine the facts proven by the evidence." (Syl. ¶ 1.)

See, also, *Sluss v. Brown-Crummer Inv. Co.*, 143 Kan. 14, 53 P. 2d 900, Syl. ¶ 5; *Albin v. Munsell*, 189 Kan. 304, 369 P. 2d 323, and *Folkerts v. Kansas Power & Light Co.*, 190 Kan. 159, 163, 372 P. 2d 997.

It is not proper to submit questions involving minor evidentiary facts, and evidentiary facts should not be confused with fact issues. The better practice is to simplify the questions by combining each to a single issue. In attempting to reach a controlling fact issue, a question of law may be so intermingled that it cannot be separated, and it is proper to submit a question which combines both fact and law. (3 Vernons, *op. cit., supra*, § 60-249a, pp. 205, 206.)

In the instant case, only ultimate issues of fact were submitted to the jury under full and complete instructions as to the law applicable, and to which the defendants did not object. The issues of fact submitted to the jury called for conclusions to be drawn from the evidence by applying rules of laws as given in the instructions.

Those were formed by the pleadings, the pretrial order, and the evidence, and the requested fact isues were embodied in the more general questions submitted to the jury. We are of the opinion the width of the road and the question whether either automobile encroached on the other's lane of traffic were, to the extent those fact questions were relevant, subsumed in the ultimate issues of fact of negligence and causation submitted to and determined by the jury in accordance with the court's instructions.

Moreover, there is nothing in the record to indicate the defendants made any objection to the failure of the district court to submit the three issues of fact in question. K. S. A. 60-249 (*a*) provides that if the court requires a special verdict and neglects to include an issue of fact raised by the pleadings or evidence, a party waives his right to a jury trial of the issue unless he *demands* its submission before the jury retires. As to an issue omitted without such *demand* the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accordance with the judgment on the special verdict. (60-249 [*a*].)

Normally where a party has once made his position known to the court, it is not necessary that he repeat it or take a formal exception when the court takes contrary action. However, in view of the emphasized portion of the statute previously quoted, its language makes an exception to that principle. The rule is stated in 2B Barron and Holtzoff, *op. cit., supra*, Section 1053, p. 334, as follows:

". . . Even where a party has requested submission of a particular issue, he will be held to have waived his right to trial by jury as to it unless he objects to the failure to submit it before the jury has retired. Though this may seem harsh, it has the salutary purpose of giving the judge an opportunity to correct any inadvertent failure to submit the issue."

Judge Gard, in his work, Kansas Code of Civil Procedure Annotated, Section 60-249 (*a*), states the following on the point:

"Under this subsection the value of special verdicts is retained and the dangers from overlooking material issues of fact are eliminated. This elimination of danger is brought about by the provision that if the judge does not cover all the issues in the submission to the jury the parties must demand the submission of such issues before the jury retires. Otherwise the objection to failure to submit an issue is waived and the judge many resolve the issue himself; or if he fails to do so by making a specific finding he is presumed to have resolved the issue in accordance with the judgment which the court renders."

The defendants complain the district court failed to give their re-

quested instructions which would have advised the jury that a roadway is that portion of a highway used for travel, and that the center of a roadway is the middle of that part thereof which has been worked, prepared and made fit for public travel. The point is not well taken. K. S. A. 60-251 (*a*) provides in substance that at the close of the evidence or at such earlier time during the trial as the judge directs, any party may file written requested instructions. Subsection (*b*) reads:

"No party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict stating distinctly the matter to which he objects and the grounds of his objection unless the instruction is clearly erroneous. Opportunity shall be given to make the objections out of the hearing of the jury."

There is nothing in the record to indicate the defendants ever made any objection of the district court's refusal to submit the requested instructions as required by 60-251 (*b*). A party may not complain of error on the part of the district court in failing to give a requested instruction unless *after* the request is denied but *before* the jury retires to consider its verdict, he states "distinctly the matter to which he objects and the grounds of his objection," unless the instruction is clearly erroneous. (*Marshall v. Nugent,* 222 F. 2d 604.) The purpose of the statute is to afford the district court an opportunity upon second thought, and before it is too late, to correct an inadvertent or erroneous failure to instruct the jury on the law applicable to the issues. The statute also serves to lessen the burden of an appellate court by diminishing the number of rulings at the trial which it may be called upon to review. (3 Vernon's, *op. cit., supra,* § 60-251.2, p. 250; Gard, *op. cit., supra,* § 251, pp. 237-239.) This has been the undeviated practice prevailing under Federal Rule No. 51. (2B Barron and Holtzoff, *op. cit., supra,* §§ 1101-1106, pp. 439-477; *Marshall v. Nugent,* supra, p. 615; *McDonnell v. Timmerman,* supra; *Crossland v. Continental Casualty Company,* 374 F. 2d 586; *Trent v. Atlantic City Electric Co.,* 334 F. 2d 847, 857.) In *Dunn v. St. Louis-San Francisco Railway Company,* 370 F. 2d 681, the Tenth Circuit Court of Appeals recently said:

". . . we warn parties that there is a heavy burden upon them in such event to show that it was done with sufficient specificity and distinctness, and we caution district courts to be slow in tolerating such procedure . . ." (p. 684.)

In construing the purpose and effect of 60-251 (*b*), this court has given a similar construction to its provisions as have the federal

courts given Federal Rule No. 51. In *Sanford v. Smith,* 196 Kan. 538, 413 P. 2d 95, it was held:

"A party may not assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection, unless the instruction is clearly erroneous." (Syl. ¶ 1.)

See, also, *Williams v. Benefit Trust Life Ins. Co.,* 200 Kan. 51, 59, 434 P. 2d 765.

In short, it takes more than a request for an instruction before a party may have appellate review of its propriety. He must raise objection to the failure of the district court to give the instruction when the court entertains objections to its instructions to the jury and before the jury retires to consider its verdict. (60-251 [*b*]; 2B Barron and Holtzoff, *op. cit., supra,* 1968 Pocket Part, § 1103, pp. 155-157; *Crossland v. Continental Casualty Company,* supra; *Trent v. Atlantic City Electric Co.,* supra.)

Following the third day of trial, the defendants had three photographs which had previously been admitted into evidence, enlarged. They offered the enlargements in evidence while their expert witness Razak was testifying, as exhibits Nos. 76, 77 and 78. They contend the district court erred in refusing to admit the exhibits. Two of plaintiffs' witnesses had identified skid marks made by Wendler's car on the photographs previously admitted into evidence. The defendants claimed they were surprised by the testimony of plaintiffs' witnesses identifying the skid marks, and contended the marks were made in the road when the drawbar of the service truck which moved Wendler's car was lowered to the ground. Prior to the trial, the defendants were furnished copies of statements of plaintiffs' witnesses, which indicated they would identify the skid marks. The enlargements showed nothing that was not shown on the photographs previously admitted into evidence. Their effect would have been merely cumulative if admitted, and their exclusion was not prejudicial. Moreover, the enlargements were not included in the pretrial order. If a pretrial order is to be effective, the court must be able to enforce it. The district court did not err in excluding the photographs.

We turn now to the question which gives this court its greatest concern. It is claimed that by a designed and persistent effort on the part of counsel for the plaintiffs, the probability and fact that the defendants were covered by liability insurance was injected into the case which materially prejudiced the defendants. As pre-

liminary to discussing the contention, it should be noted the defendants made no complaint in the court below, nor here, that the amount of the verdict was excessive, or that it was not supported by the medical evidence.

The record shows that during the jury's deliberation, the following was received by the district court:

"Question by Jury to the Court:

"1. Amount of liability Ins. of Mrs. Bott and Mr. Wendler.—There is a lot of money involved here and we do not want to leave either party penniless.

This we need to know—Please.

"Answer by the Court:

"In answer to your inquiry you are advised that you should carefully read and consider the Court's instructions. Also consider the evidence you have heard in Court. The instructions are complete and they cover the law in this case. Further answer cannot be made by the Court."

The basis of the defendant's argument is that during the cross-examination of two of their witnesses, the name of Dean Langhofer was spoken, and reference was once made to an individual present in the courtroom whose name was not mentioned. Those two men were representatives of the defendants' insurance carrier and assisted counsel in investigating the case, but the district court did not allow that fact to be brought out. In addition, and in support of their motion for a new trial, the defendants filed the affidavit of the vice president of their insurance carrier wherein it was stated that Langhofer was in charge of its Hays, Kansas, office and adjusted claims that occurred in Rush County; that three members of the jury had directly or indirectly dealt with Langhofer concerning losses sustained to their automobiles during the past year or two and which were paid by the insurance company as a result of policies issued to them. The affidavit further stated that plaintiffs' counsel had been employed by the insurance company during the past five years to handle various types of claims serviced by Langhofer; that he was aware Langhofer was employed by the company and settled claims in Rush County, and that counsel was presently employed by the company on a matter not yet concluded.

Plaintiffs' counsel filed a counter affidavit in which he stated he had no knowledge concerning Langhofer's alleged settlement of claims of members of the jury except he was aware Langhofer was a field adjuster for the company working in Hays, but his territory was unknown to counsel. He stated he had not made a count of

the number of cases he had defended for the company and neither affirmed nor denied he was presently employed by the company; that he recalled only one claim in which he had personal conferences with Langhofer and stated he had no other direct dealings with him. He further denied he had intimate knowledge of the business of the company or that he knew it wrote a large volume of insurance in Rush County, or that Langhofer regularly worked for the company in Rush County.

During the cross-examination of Wendler, and at the request of plaintiffs' counsel, a conference was had by court and counsel in chambers. Counsel stated:

". . . Now, I am asking for a protective order, if there is the use of any statements made, as to who took them, when they were taken and why he took them, unless there is good cause shown, first."

Counsel for the defendants stated he had no objection, and the order was accordingly made.

As indicated, during the cross-examination of the defendants' expert witness, who prepared a scale drawing of the roadway from the Sheriff's accident report and drew thereon the position of the vehicles, he was asked who employed him. After looking at his notes, he stated "Dean Langhofer." Counsel for defendants asked for a recess in chambers. Counsel stated that plaintiffs' counsel knew Langhofer had been an adjuster for the insurance company; that he knew the inference of his question to the expert witness and it was an attempt to inject insurance into the case in violation of the protective order. Following a colloquy between court and counsel, counsel for the plaintiffs stated he was entitled to show who employed the witness to prepare the drawing, and who the agent represented. The court stated it was not going to permit insurance to be injected into the case and directed the trial to proceed.

On another occasion, one of the plaintiffs' witnesses, called as a witness for the defendants, testified he gave a statement to the defendants' representative when he was in the field baling hay, and that a court reporter was present. On cross-examination he was asked if Langhofer was the representative's name and he replied he did not remember. When asked if he remembered who the man was representing, the court stated, "I am going to deny you the right to go further in this regard."

Later, during the trial, the sheriff of Rush County was testifying

on behalf of the defendants concerning his accident report. On cross-examination he was asked whether he had talked to a number of people, "for instance, that gentleman . . . right back there with the glasses? Did you ever talk to him?" Again the court admonished counsel for the plaintiffs and the witness was not allowed to answer. The "gentleman" was never identified further for the jury, and no indication of his association with any insurance company was made.

Thereafter, and out of the presence of the jury, counsel for the defendants moved the court to declare a mistrial for the reason "the plaintiffs have consistently attempted to inject insurance into the case . . . particularly by referring to Dean Langhofer." In ruling on the motion, the court stated:

"I am in a position . . . to make a finding on this matter . . . I don't think Mr. Turner has attempted to violate the prohibitive order we had, willingly. I don't think it is a plan on his part. I think if he violated it he did it because of his make-up—his character—his enthusiasm—his intenseness —sometimes it is excusable and sometimes it isn't, and it's come into this thing a couple of times, Mr. Turner, when I had to stop you and you knew when you started that—not when you started, but after you said it you realized where you were and you stopped, and I appreciate it very much, and then I stopped you and I personally think that that is evidence of a man being a good attorney and trying to do everything for his client, and you are to be complimented for it and we have to use a little discretion and the Court has to use its discretion, and one of them is not to do those things even though your training and your tenseness makes you do it. Now, I am going to deny your motion . . . for a mistrial, and I want you both to be officers of the court as well as advocates, and remember not to bring any more of the possibility of insurance into this thing."

This court frowns on the practice of using one means or another to suggest to the jury that the defendant is covered by liability insurance. (*Cannon v. Brown*, 142 Kan. 700, 704, 51 P. 2d 1007.) Evidence tending to show that the defendant is covered by liability insurance is generally inadmissible because (1) it is usually irrelevant to any of the issues in the case, and (2) it may tend to influence jurors to find against defendants or to bring in excessive verdicts. (1961, Goldstein, Lawyer's Trial Guide, Mention of Insurance During Trial [Phillips], p. 247.) See, also, K. S. A. 60-454. The ruling, however, is qualified by a number of exceptions. Where the fact of insurance is relevant to issues in the case, it can, of course, be shown. (*Dirks v. Gates*, 182 Kan. 581, 322 P. 2d 750.) In the instant case, at no place does it appear the jury was allowed to hear

from the testimony of any witness or from statements of counsel, the word "insurance" or the word "adjuster." It is argued, however, that the mention of Langhofer's name was the equivalent to "injection of insurance" since some of the jurors had had dealings with him and might remember him, and might assume he was acting for the insurance company at the time in question. It seems unlikely in the extreme that under the circumstances any of the jurors would have recognized Langhofer's name since he was not a resident of Rush County. The best indication of just how much impact the mention of Langhofer's name might have had on the jury is found in the district court's comments denying the defendants' motion for a mistrial, which read:

"The other thing, I didn't know that—whatever this person was in Hays you were talking about—I had never heard of him and when his name was mentioned I didn't know he was a claims agent and I think that the knowledge I have is knowledge in this area of men in common, with men in general, so I don't believe your jury knows about it. If they do, it is an exception of the rule."

Moreover, the record indicates that Langhofer was present throughout the trial and it would seem unlikely he would fail to advise counsel when the jury was being impanelled that he had made prior settlements with three proposed members. It cannot be argued that counsel for either side, in any kind of a lawsuit, would knowingly attempt to select jurors not favorable to their position. (*Thompson v. Barnette,* 170 Kan. 384, 389, 227 P. 2d 120.) Since the three jurors in question were allowed to remain on the jury, it is reasonable to assume the defendants anticipated they were happy with and loyal to their insurance carrier. But those facts were unknown to the plaintiffs. The defendants cannot now be heard to complain that because Langhofer's name was twice mentioned during the trial, the three jurors were prejudiced thereby when the defendants had nine peremptory challenges to exercise but, instead, permitted the three jurors to remain on the panel. On this point the court stated there had been no intentional misconduct by counsel with respect to Langhofer. While not factually analogous, we refer to *Thompson v. Barnette,* supra, where the same principle was involved, and it was said:

". . . Indeed, the trial court in denying the motion for a mistrial and to discharge the jury commented that he was well satisfied there had been no intentional misconduct by counsel and that the mention of insurance was purely inadvertent . . ." (l. c. 389.)

Under the circumstances which attend, it has not been made to appear that prejudice resulted from what manifestly appears to have been an inadvertent action on the part of counsel for the plaintiffs in cross-examining the witnesses referred to. This court is of the opinion there was no persistent effort on the part of counsel or lack of good faith, and that reference to Langhofer was not prejudicial to the defendants. (*Caylor v. Atchison, T. & S. F. Rly. Co.,* 189 Kan. 210, 368 P. 2d 281.)

Furthermore, there is nothing in the record to suggest that the jury's question to the court concerning liability insurance was motivated by any reference to insurance at the trial, nor does such fact suggest insurance was improperly injected into the case. It is general knowledge that most drivers today have liability insurance, and neither party to a lawsuit should be prejudiced by a question which may be prompted by the jury's own experience and common knowledge of the affairs of mankind. As indicated, the district court and counsel did not consider the award excessive, and the defendants have never contended the verdict was not supported by the medical evidence. Against this background, the argument that the jury's award was accelerated by the alleged insurance factor is not persuasive.

The foregoing disposes of the basic questions presented in this appeal. However, we briefly comment upon one of two other points raised by the defendants. It is contended the court erred in permitting counsel to cross-examine the defendants' expert witness Razak, who gave an opinion as to how the automobiles came together and how they were traveling so as to cause the resulting damage. Whether he considered skid marks was an important element in reconstructing the accident. The latitude permitted in the cross-examination of an expert witness is even wider than in the case of an ordinary opinion witness. No rule can be laid down that would determine the extent and limitation of cross-examination allowable in every case. Generally speaking, the matter must rest in the sound discretion of the judge trying the case. This court has stated the general rules in *Bourgeois v. State Highway Commission,* 179 Kan. 30, 292 P. 2d 683, and *Regnier Builders, Inc., v. Lindwood School District No. 1,* 189 Kan. 360, 369 P. 2d 316. Cross-examination of Razak on skid marks was not improper; there was no abuse of discretion by the district court in permitting it, and no reversible error c᷉n be predicated thereon.

It is also contended the plaintiffs deliberately withheld their expert witness, Weiland, and had him testify in rebuttal what the plaintiffs should have presented in their case in chief. An examination of the record indicates that Weiland's testimony was rebuttal testimony of Razak's testimony. Razak gave an expert opinion on accident reconstruction and Weiland simply rebutted his testimony. The order of proof is within the sound discretion of the district court. (*Van Welden v. Ramsay's Inc.,* 199 Kan. 417, 430 P. 2d 298.) Assuming, *arguendo,* Weiland's testimony was not strictly rebuttal, there was no showing of abuse of discretion so as to constitute reversible error. In *In re Estate of Cox,* 184 Kan. 450, 337 P. 2d 632, it was said:

". . . We are committed to the rule that it is discretionary as to whether a trial court shall permit a party to reopen a case to introduce additional evidence in support of his case in chief and our decisions approve that practice where the record fails to disclose conduct amounting to abuse of discretion. (*In re Estate of Wittman,* 161 Kan. 398, 402, 168 P. 2d 541.)" (l. c. 452.)

See, also, 53 Am. Jur., Trial, §§ 120, 121, pp. 106, 107.

It is further contended the district court erred in overruling the defendants' motion for a new trial on the grounds of surprise and newly discovered evidence. The record in this case contained over 300 pages of printed matter. A very large portion of it consisted of post-trial affidavits obtained months after the trial of witnesses who testified, of persons who were considered as witnesses but who were not actually used, and of persons who were residents of the area but were allegedly not interviewed before the trial. Shortly after receipt of the motion for new trial and the affidavits in support thereof, the plaintiffs contacted the affiants and counter affidavits were obtained. To take up and discuss in detail each of the factual situations of the various affidavits would extend this opinion beyond all reason and certainly would contribute nothing to the body of the law.

Against this background, we turn to the applicable law. K. S. A. 60-259 is couched in discretionary language, and the overriding rule is that the granting of a new trial on the grounds of surprise or newly discovered evidence is discretionary on the part of the district court, and it will not be reversed unless a clear abuse of discretion is shown. In *Perry v. Schoonover Motors,* 189 Kan. 608, 371 P. 2d 152, this court held:

"The granting of a motion for a new trial upon the ground of newly dis-

covered evidence lies within the discretion of the trial court, and where the facts indicate a lack of diligence on the part of the complaining party, the trial court does not abuse the exercise of its power of discretion by refusing to grant a motion for a new trial." (Syl. ¶ 5.)

We have carefully examined all the affidavits and in none of the defendants' affidavits is there any affirmative showing why the evidence could not have been produced at the trial under reasonable diligence. The defendants' main ground of surprise is that some of the witnesses did not subscribe to their version of the accident. No clear abuse of discretion has been shown on the part of the district court in overruling the motion for a new trial.

Other points raised have been carefully examined and we think it is unnecessary to further extend this opinion by discussing them. It is sufficient to say this was a hotly contested lawsuit involving a lengthy trial by a jury. The evidence and theories of the collision were seriously disputed, but the district court conscientiously protected the interests of the parties. Both parties had their day in court, each diligently presented their side, and the jury made its decision. Its answer to question No. 2 was consistent with its answer to question No. 1, and was in keeping and consistent with instruction No. 15, and there was substantial evidence to support all the answers of the jury. The defendants have not affirmatively made it appear the district court committed prejudicial error which would warrant the granting of a new trial. See K. S. A. 60-2105; 3 Vernon's, *op. cit., supra,* § 261.1, p. 531, and Gard, *op. cit., supra,* § 261, p. 279.

The judgment of the district court is affirmed.

SCHROEDER, J., dissenting: Counsel for the Wendlers by persistent suggestive questions put to witnesses during the trial deliberately injected before the jury the fact that the Botts were covered by liability insurance, thereby prejudicially affecting their right to a fair trial by an impartial tribunal. By reason thereof the trial court should have granted the Botts' motion for a mistrial.

This case takes on added significance when the trial strategy indicated by the record is disclosed. The three consolidated cases were tried and argued on appeal by H. Lee Turner of Great Bend, Kansas, and Evart Mills of McPherson, Kansas, who number among the legal giants of this state in the field of trial strategy and practice. The cases were heard by a capable and efficient trial judge.

Now, when the trial judge in his pretrial order consolidated the three cases involved for trial and designated the court procedure and burden of proof, he ordered that the Wendlers, represented by Turner, should be considered and called plaintiffs, and that the Botts, represented by Mills, be considered and called defendants. The order states: "The Wendlers will be permitted to open the case and close the same. The plaintiff, Ruby A. Bott, as an individual and as administratrix of the estate of Henry A. Bott, deceased, will be treated as the defendant. The burden of proof, however, shall not be shifted from the parties asserting their respective claims."

The pretrial order dealt with the listing of witnesses well before trial, the exchange of evidence and statements taken by persons other than counsel, and other matters.

It is not surprising then that Turner, in this advantageous position, sought and procured a protective order from the trial court during the cross examination of Wendler, to protect his clients from the possibility of "inadvertent" or "unintentional" injection of their liability insurance coverage. Under this protective order his clients and the witnesses who testified on their behalf *presenting their evidence first* were protected by the order from his adversary. But, when the plaintiffs' evidence was all in and the plaintiffs rested, the well conceived plan to inject liability insurance coverage of the defendants before the jury *was vigorously pursued.* Turner argued when first called into chambers by the trial court:

"THE COURT: He's trying to keep out the insurance angle—

"MR. TURNER: It's just like a statement. If a statement is used, as the Court will knows, you can go all the way if you have a valid reason for using the statement, showing who took it and the reason for the person taking it, and I am certainly entitled to show who instructed him and I think I am entitled to show the jury what they were trying to do and what they are trying to accomplish."

The Wendlers will be referred to as the plaintiffs and the Botts as the defendants, as they were designated in the court's opinion.

On the motion for a new trial it was disclosed by Harold F. McFarland, the vice president of the Alliance Mutual Casualty Company, by affidavit, that H. Lee Turner, attorney for the plaintiffs in the instant case, had been regularly employed by that company for more than the past five years; that Turner had handled forty cases for the company from April, 1964, to February, 1967, and was

presently employed by the company. He further stated that Dean Langhofer was field adjuster for Alliance Mutual Casualty Company and had charge of the Hays, Kansas, office, but spent a day each week in La Crosse, Kansas, to take care of claims arising in Rush County, Kansas, where this case was tried, and that Turner was well aware that Langhofer regularly went to Rush County.

By reason of Turner's close connection with Alliance, he was aware or had reason to believe that if he established that Dean Langhofer did any work for Mrs. Bott, someone on the jury would be apprised that Mrs. Bott was insured by Langhofer's insurance company.

McFarland's affidavit disclosed that Dean Langhofer settled four different losses on four different dates in 1965 and 1966 with Gerald M. Bornholdt, one of the jurors, insured by Alliance. Langhofer settled on behalf of Alliance two different losses in 1965 and 1967 with Billy T. Allen, the husband of Alice M. Allen, one of the jurors. In 1966 Langhofer settled on behalf of Alliance a loss with Arnold L. Oaks, another member of the jury. Langhofer also settled on behalf of Alliance a loss in 1966 with Dechant Ford Motor Company, of which James L. Cooley, one of the jurors, was the bookkeeper.

Therefore, one-third of the members of the jury who heard this case had directly or indirectly dealt with Dean Langhofer in his capacity as an Alliance insurance company representative in the recent past.

Various incidents occurred during the trial. On cross examination of the defendants' witness, John W. Smith, an engineer, Turner asked:

"Q. You were called on November 20th, 1965, to do this work?
"A. Yes.
"Q. Who called you, sir—look at your notes?
"A. Dean Langhofer."

Thereupon counsel for defendants requested a short recess and retired into chambers with the court where objection was made to the injection of Langhofer's name on the ground that Turner was deliberately trying to inject insurance into the case. The trial court's attention was called to the fact that Turner had done a lot of work for Alliance and knew very well what he was doing. Turner argued as heretofore quoted.

Apparently the court's admonition—"I think it is also close to a

violation—" of the protective order to keep insurance out of the case—was not enough warning for Mr. Turner and further incidents occurred. On redirect examination Smith, a witness for the defendants, stated that Mills had sent him a check for his services. On recross examination by Turner he was asked:

"Q. Was it Mr. Mills' check or someone else's check?
"THE COURT: All right, you may step down. We are not going to do anything further about that."

On examination of Henry Schwartz, defendants' witness, he was asked on recross examination by Turner:

"Q. A man came to see you out in the middle of the field, didn't he?
"A. Yes, sir; I was bailing feed.
"Q. His name was Mr. Dean Langhofer, of Hays, Kansas, wasn't it?
"A. I don't remember his name.
"Q. He told you that he was there representing—
"THE COURT: Just a minute, Mr. Turner! I am going to deny you the right to go further in this regard."

On cross examination of Jack Mendenhall, defendants' witness, Turner asked:

"Q. And since that time you have talked to a number of people—for instance, that gentleman right back there (indicating)—right back there with the glasses? Did you ever talk to him?
"A. He was one of—
"THE COURT: Just a minute, Mr. Turner; I've asked you to stop that and I am not going to permit it any more. Now, let's stop it. Don't get me—you know what happened; now let's proceed."

Counsel for the defendants then moved for a mistrial. The trial court overruled the motion in accordance with the statement and findings quoted in the court's opinion, finding in substance that Mr. Turner had not attempted to violate the prohibitive order willingly. It is not surprising that the trial court overruled the motion, because it wanted an authoritative decision of the Supreme Court on a record which squarely presented the issue.

After making the foregoing ruling the trial court stated:

"And, I don't mind you taking it to the Supreme Court. I would like to know just how far we can go, *because I think we have gone a lot too far* and I think the Court should have more—I should exercise more power of curtailing cross-examination." (Emphasis added.)

The record discloses the jury clearly understood from the evidence the defendants carried liability insurance. After the jury retired to the jury room, it asked only one question and that was *how much*

*insurance* the parties had. It did not ask whether the defendants had any insurance. The question asked the court by the jury was as follows:

"*Amount of liability Ins. of Mrs. Bott and Mr. Wendler.*—There is a lot of money involved here and we do not want to leave either party penniless.

"*This we need to know—Please.*" (Emphasis added.)

It is equally clear liability insurance was being considered by the jury in its deliberations on a verdict. The jury awarded the Wendlers $27,213.84 for the death of their fifteen year old daughter, the exact amount they requested, and the jury also awarded Arthur Wendler $100,000, an exceptionally large verdict for a rural Western Kansas community.

This court has heretofore held that the deliberate injection of insurance into a case required a reversal of the judgment. In *Witt v. Roper*, 150 Kan. 722, 96 P. 2d 643, the court said:

". . . The impropriety of implanting in the minds of the jury the likelihood that any damages assessed in a highway collision case will eventually be paid by some insurance company and not by a defendant in a lawsuit has often been considered and usually condemned by this and other courts. (*Coffman v. Shearer*, 140 Kan. 176, 181-182, 34 P. 2d 97; *Pool v. Day*, 141 Kan. 195, 40 P. 2d 396; *Forsyth v. Church*, 141 Kan. 687, 42 P. 2d 975; 'Anno—Informing Jury of Liability Insurance,' 95 A. L. R. 388-417; id., 105 A. L. R. 1319-1338.) In *Cannon v. Brown*, 142 Kan. 700, 51 P. 2d 1007, we said:

" 'This court frowns on the practice of using one means or another to give the jury a hint that the defendant is covered by liability insurance, . . .' (p. 704.)" (p. 725.)

In *McGuire v. McGuire*, 152 Kan. 237, 103 P. 2d 884, this court said:

"This court has repeatedly stressed the impropriety of injecting the question of insurance into damage actions in which insurance companies are not parties, *when it is obvious that the purpose is to produce prejudice in the minds of the jury.* Where the offending party secures a verdict and opposing party by timely objection and otherwise has adequately protected the right of review, *the offense is regarded as so inherently prejudicial as to require reversal unless unusual circumstances are shown which justify affirmance.* (*Witt v. Roper*, 150 Kan. 722, 96 P. 2d 643; *Jones v. Pohl*, 151 Kan. 92, 98 P. 2d 175.)" (p. 240.) (Emphasis added.)

A statement made by this court in *Thompson v. Barnette*, 170 Kan. 384, 227 P. 2d 120, is most unfortunate. There the court said:

". . . as we read this record, it is not made to appear that any prejudice resulted from what manifestly appears to have been an inadvertent reference on the part of plaintiff while on the witness stand. Indeed, the trial court in denying the motion for a mistrial and to discharge the jury commented that

he was well satisfied there had been no intentional misconduct by counsel and that the mention of insurance was purely inadvertent. . . ." (p. 389.)

The trial court seized upon this statement to deny the motion for a mistrial, and this court on appeal has seized upon it to affirm such ruling. The trial court in the first instance found there had been no intentional misconduct by counsel for plaintiffs with respect to the injection of the name of Langhofer at the trial, when the motion was first asserted at the trial, but failed to mention other indirect references by counsel designed to inject insurance. In my opinion, the finding of the trial court was unwarranted by the record, but assuming that it was, the question put to the court by the jury and further disclosures at the hearing on the motion for a new trial should have dispelled any doubt, and a new trial should have been granted.

The court in its opinion quotes *Thompson v. Barnette,* supra, upholding the trial court's finding that the misconduct of counsel for the plaintiffs was not intentional.

In *Thompson v. Barnette,* supra, the decision was by a divided court, and the statement made in the quotation *was qualified* by the fact that it *was not made to appear that prejudice resulted* from what manifestly appeared to have been an inadvertent reference on the part of the plaintiff while on the witness stand. There the plaintiff asked for $25,000 and the jury returned a verdict for $10,000.

I am convinced, had the same members of the Supreme Court been sitting on this case, they would have reversed the trial court on the point under consideration. *Thompson* does not stand for the proposition stated in the court's opinion.

In my opinion, when the insurance feature is improperly brought to the attention of the jury, the prejudicial effect thereof is immediate *whether innocently or designedly accomplished,* if the party seeking recovery of damages or his counsel is responsible therefor. Under these circumstances, the rights of the adverse party are prejudicially affected. The failure of a trial court to declare a mistrial upon proper and timely motion where the question of insurance is improperly injected into the trial constitutes reversible error.

Under the rule stated by the court in its opinion—that unintentional injection of insurance into the case is excusable—the practice of law in damage actions for personal injury will develop into an art whereby a well conceived and calculated plan by ingenious

counsel designed to inject insurance "inadvertently" or "unintentionally" will pay big dividends. This practice will penalize litigants who employ honest counsel, who observe the rules of legal ethics, and reward those who employ the dishonest, and also reward the dishonest practitioner. A decision of this nature by a court of last resort is subject to serious question, and brings the whole legal profession into disrepute with the public.

The court asserts as an additional reason for its holding that: "It is general knowledge that most drivers today have liability insurance, and neither party to a lawsuit should be prejudiced by a question which may be prompted by the jury's own experience and common knowledge of the affairs of mankind." This argument was answered in *Walley et al. v. Williams*, 201 Miss. 84, 28 So. 2d 579 (1947). The court there said:

".   .   .   Moreover, we must decline to consider that jurors are aware as a matter of current knowledge that all employers carry liability insurance; but if we should accept that proposition as true, we would be confronted with the deeper question whether trials before jurors of personal injury cases would be valid under the due process clause of the federal constitution, the effect of which is to require that trials shall be [before] impartial tribunals of which tribunals in common law cases the jury is an essential part,—unless waived by the parties." (pp. 90, 91.)

If the court is attempting to change Kansas law relative to the admission of liability insurance in evidence in a case of this nature, it is contrary to K. S. A. 60-454, which definitely prohibits the admissibility of such evidence on considerations of public policy. This section, effective January 1, 1964, is consistent with prior Kansas decisions, and provides:

"Evidence that a person was, at the time a harm was suffered by another, insured wholly or partially against loss arising from liability for that harm is inadmissible as tending to prove negligence or other wrongdoing."

Prior decisions in this jurisdiction where the trial court was affirmed, after insurance was injected, were based on the proposition that the record disclosed no prejudice. In *Dirks v. Gates*, 182 Kan. 581, 322 P. 2d 750, the plaintiff sought judgment in excses of $25,000, and the verdict was for $9,048.26. Also, in *Caylor v. Atchison, T. & S. F. Rly. Co.*, 189 Kan. 210, 368 P. 2d 281, decided by a divided court, the suit was for $35,000 and the verdict was for $15,000.

The court's opinion in an attempt to explain its decision and assign reasons therefor, says:

"Moreover, the record indicates that Langhofer was present throughout the trial and it would seem unlikely he would fail to advise counsel when the jury was being impanelled that he had made prior settlements with three proposed members. It cannot be argued that counsel for either side, in any kind of a lawsuit, would knowingly attempt to select jurors not favorable to their position. (*Thompson v. Barnette*, 170 Kan. 384, 389, 227 P. 2d 120.) Since the three jurors in question were allowed to remain on the jury, it is reasonable to assume the defendants anticipated they were happy with and loyal to their insurance carrier. But those facts were unknown to the plaintiffs. The defendants cannot now be heard to complain that because Langhofer's name was twice mentioned during the trial, the three jurors were prejudiced thereby when the defendants had nine pre-emptory challenges to exercise but, instead, permitted the three jurors to remain on the panel. . . ."

This argument is frivolous. The jury is impanelled *before* the trial of a case. The court's statement assumes counsel for the defendants to be *clairvoyant and obligated to anticipate* that counsel for the plaintiffs will "inadvertently" or "unintentionally" inject the defendants' liability insurance coverage into the trial of the case before the jury. Absent the injection of the name of Langhofer into the case, none of the jurors would know his insurance company was involved, and there is no reason whatever suggested in the record that the defendants or their counsel were obligated to anticipate or assume the jurors who settled insurance claims with Langhofer "were happy with and loyal to their insurance carrier" at the time the jury was impanelled. Under these circumstances failure to exercise preemptory challenges thereby permitting "the three jurors to remain on the panel" is irrelevant and immaterial.

The court in its opinion says: ". . . the defendants made no complaint in the court below, nor here, that the amount of the verdict was excessive, or that it was not supported by medical evidence." If this statement is designed to infer that the defendants have failed to assert the amount of the verdict in each case as indicating that it was given under the influence of passion and prejudice, it is erroneous. Further in the opinion the court says: "As indicated, the district court and counsel did not consider the award excessive, and the defendants have never contended the verdict was not supported by the medical evidence. Against this background, the argument that the jury's award was accelerated by the alleged insurance factor is not persuasive."

The record discloses the defendants raised in their motion for a new trial, among other points, the following:

"1. Misconduct of the plaintiff in insinuating and suggesting that defendant had insurance and otherwise injecting defendant's insurance into this matter.

"3. The verdict . . . was given under the influence of passion and prejudice.

"7. Failure of the Court to declare a mistrial."

The trial court overruled the motion for a new trial and the defendants appealed from such order, among others. In the statement of points the defendants specified, among others, that "The Court erred in refusing to hear oral testimony in support of defendant's motion for new trial," and another to the effect that the trial court erred in refusing to declare a mistrial because plaintiffs conveyed to the jury the defendants' insurance coverage.

The record discloses the amount of the verdict in each case was before the trial court, and before this court on appeal, as indicating passion and prejudice because the insurance feature was improperly brought to the attention of the jury by plaintiffs' counsel.

The jury's only question to the court shows it was more interested in the amount of insurance coverage of the respective parties than it was in determining the issues of negligence. The question specifically says the jury did "not want to leave either party penniless."

Informing the jury that the defendants carried liability insurance in the manner heretofore indicated by counsel for the plaintiffs materially prejudiced the substantial rights of the defendants. The one question of the jury to the court indicated it knew there was insurance and that it was considering the defendants' insurance in its deliberations. That such was inherent in the verdict is shown by the amounts awarded by the jury in each case.

Where a valid ground is asserted for the reversal of a judgment, which requires the granting of a new trial, consideration of other points asserted for reversal of the judgment is immaterial. Accordingly, I express no opinion concerning other points treated in the court's opinion.

It is respectfully submitted the judgment of the lower court should be reversed and a new trial granted.

PRICE, C. J., dissenting: From the question asked by this jury during its deliberation it is very apparent to me that it was more concerned with the amount of insurance coverage than with the issues of the case. I would grant a new trial.